All right, next case of the afternoon is number 18-5099-4, Stratta v. Rowe. Mr. Jones. Mr. Cullum Jones, right? That's correct, Your Honor. Good afternoon, may it please the Court. At heart, our case is about a federal court's jurisdiction to hear cases seeking to vindicate a plaintiff's right to compensation for taking of his property and to equal protection under the law. The district court below dismissed Appellant's causes of action, 12B stage, finding that the Eppley Groundwater Conservation District, or GCD, was an arm of the state for the purposes of 11th Amendment immunity. The district court also found that Fazzino's takings claims were not right under the Williamson County state litigation requirement. Despite having found that he didn't have jurisdiction of the case, the district court went on to determine that he would abstain from exercising jurisdiction under the Burford Doctrine. While this case was on appeal, the Supreme Court reversed the Williamson County state litigation requirement and obviated the rightness grounds upon which the district court's dismissal was partially based. And you're representing Mr. Fazzino, right? That's correct, Your Honor. Okay. This court should reverse the district court and amend the cause for trial because the groundwater conservation districts are not entitled to 11th Amendment immunity. Well, you represent both, Strada and Fazzino. That's correct, Your Honor. It's a little odd that you represent a guy that's suing a board that your other client's on. I suppose so. At any rate, the 11th Amendment immunity do not apply and Burford abstention is not warranted as the requirements for that abstention doctrine are not present here. This court employs a six-factor test to determine if an entity is entitled to 11th Amendment immunity. These Clark factors are one, whether the state statutes and case law view the agency as an arm of the state. Two, the source of the entity's funding. Three, the entity's degree of local autonomy. Four, whether the entity is concerned primarily with local as opposed to statewide problems. Five, whether the entity has authority to sue and be sued in its own name. And six, whether the entity has the right to hold and use property. Groundwater conservation districts generally, and this GCD in particular, fail to meet any of these six factors. Texas state statutes and case law consistently acknowledge that groundwater conservation districts are political subdivisions of the state and regarded in a relationship as to the state on the same dignity as a county. This court in Williams v. Dart looked towards the Texas Court Claims Act to determine what statute or to determine how statutory authority treated Dart in that case. The statute quoted by this court from the Tort Claims Act today reads that state government means an agency, board, commission, department, or office other than a district or authority created under Article 16, Section 59 of the Texas Constitution. The district court, on Polly's behest, had found that the state statutes and state case law view groundwater conservation districts as arms of the state because the single case that says that the groundwater conservation districts are, or rather entities created under Article 6, Section 59 of the Texas Constitution, are generally arms of the state. The fact that the Tort Claims Act now states that the state government does not include agencies created under Article 16, Section 59 shows that that line of reasoning was pretty much invalid. Also, this court's opinion in Southwestern Bell v. the City of El Paso involved a similar district that was created under Article 6, Section 59 of the Texas Constitution, and that court found that the district was not entitled to 11th Amendment immunity. The second factor and the most weighty factor in determining the existence of 11th Amendment immunity is whether or not the state will end up paying any judgment. Technically, you're looking at how the district is funded. This district is funded by fees. Other groundwater conservation districts are funded through fees or taxes. But there is the option for the state to contribute funds. The state can contribute funds to groundwater conservation districts to reach the goals that are set forth in its statute in Chapter 36. However, those funds aren't earmarked or really even intended for the payment of judgment debts. In fact, judgment debts rendered against the districts can be paid. A court can order, pursuant to 36066B of the Texas Water Code, can order the district, the groundwater conservation district, to levy taxes and assessments in order to meet judgment debts. So there is a mechanism in Chapter 36 by which groundwater conservation districts can be made to pay judgments. That doesn't include them having to go and ask for money from the state because, as this court put it out in Vought v. Board of Commissioners, that kind of after-the-fact funding doesn't really rise to the level of reaching the state treasury that the 11th Amendment is concerned with. Are you planning on spending a lot more time on the 11th Amendment because you've got several factors to go through there? There are a lot of factors. You have lots of other issues. I'm just wondering whether you— Sure. You know, the more interesting question here, honestly, is the Burford abstention doctrine. The court brought it up sua sponte, as I said, after finding that it didn't have jurisdiction over the case. And if Your Honors would prefer a discussion of whether or not that doctrine should apply, I can skip past the rest of the 11th Amendment. I think that's a pretty significant issue. I would agree. The Burford abstention doctrine doesn't apply here because, well, one, none of the factors are met. But most importantly, under this court's precedent in Webb v. B.C. Poultry, the fact that we're seeking compensation ought to remove this case from the reach of Burford. At a minimum, the district court should have stayed rather than dismissing the case. However, even if this case is reached by Burford, the Burford abstention doctrine is not implicated here because, one, it doesn't meet any of the six factors. But most importantly, and on a whole, Burford abstention is concerned with interference within a unified state regulatory system. And we don't have a unified state regulatory system. So their argument in this case is that the classification of groundwater as having correlative rights is something that really hasn't been evaluated by the state courts. I don't believe that's true, Your Honor. If you go back and read through the Day opinion, it's pretty clear on how— Correct? Correlative rights are—it's effectively a common law concept. The district has taken the position that correlative rights only exist if the legislature provides correlative rights. Let's assume that I agree with you, okay, that there are correlative rights. But that doesn't necessarily mean that this district has to allot water proportionately to the surface ownership, right? It's not required by statute to allot water in that fashion. However, it did. In this case, that's how they chose to allocate their production limitations. Well, actually, it didn't vis-a-vis the city of Bryan. It didn't vis-a-vis the city of Bryan. That's what created the taking. But they claim they don't give waivers, right? Yes, they claim they don't. They gave a waiver but claimed they didn't. That's essentially what happened. They basically created this classification of an existing well that applies to, as far as I'm aware, only the city of Bryan's well. And that classification of well doesn't have any sort of production limitation or spacing requirement attended to it. Now, the fact that the district's rules are based on these spacing requirements and production limitations that take into account an acre-foot-per-acre of ownership basis means that, according to those rules, Anthony Fazzino's well or Anthony Fazzino's land is within the cone of the prescient impact of the district's well. So the only legal issue in terms of his ownership rights that needs to be determined in order to find a taking is whether or not water is being taken from underneath his land and given over to the city of Bryan. But let me ask you a question, though. If this were an oil and gas property, you could have forced unitization, I suppose, basically. There could be forced unitization. Well, okay, let me just put it another way. Mr. Fazzino is not the only landowner within this cone of depression. No, he's not. But he's the only plaintiff, right? He's the only plaintiff in this case. So if we – if a federal court were to give Mr. Fazzino the remedy that he seeks, which apparently is permission to also pump 300,000 – no, 3,000 GPM, then what would the other land – what would their rights be? Their right ought to be, just like Fazzino's right ought to be, compensation for the decrease in value that their property has as a result of the groundwater being drained effectively. Now, I'm sure the appellees will come up here and say that the water will recharge and that you don't actually have a molecule for molecule. No, but I guess – but I'm feeding back into the Burford idea because if Mr. Fazzino were the surrounding landowner and his land was contiguous with the boundaries, whatever this acreage was that would allow pumping 3,000 gallons per minute and X number, you know, whatever the city of Bryan is doing, then it would just be a two-party dispute. But this is not a two-party dispute, rationally speaking, because surely the groundwater, as you just conceded, affects other landowners, and why shouldn't the Groundwater Conservation District have a duty to all of the landowners? I believe that the Groundwater Conservation District does have a duty to all the landowners to ensure that the city of Bryan buy the groundwater rights that it is using under their current regulatory structure. Well, but that – to me that suggests the possible argument that the state courts ought to work this out. I think the federal courts would be perfectly capable of determining these issues. The only real substantial question of state law is whether or not Anthony Fazzino and the surrounding landowners own the water under their property in place, and that was answered conclusively by the Day opinion back in 2012. It's not a complicated issue of state law, and it's not an ongoing kind of thing. Okay, so suppose the federal court issues a declaratory judgment that you have correlative rights, and then what? We're not seeking a declaratory judgment that we have correlative rights. No, you're seeking either money or else the right to pump 3,000 gallons per minute also, and then drain the reservoir to the disadvantage of all the surrounding landowners. Right, and I can't speak to why the surrounding landowners aren't concerned about drainage from under their property. I can only speak for my client. Well, I'm only speaking for what are the interests of Texas, which created – I'm not saying this district operated in anyone's best interest, but it created these groundwater conservation districts to prevent precisely the problem of everybody sipping as much as they could from straws from the same pond. You're right, and actually that leads into an interesting point within the Burford Doctrine, which is whether or not there's a comprehensive state regulatory structure. This aquifer, the aquifer regulated by Brazos County Groundwater Conservation or Brazos Valley Groundwater Conservation District, the Simsboro, actually extends into counties north of the groundwater conservation district that have absolutely no regulatory authority. There's no – it's what's called a white zone. There's no GCD. You're about to run out of time, so I want to ask you a question on the Open Meetings Act. So as an ordinary registered voter in Dallas County, I would be allowed to go out and advocate for somebody for Congress or Senate or president or whatever or against them or so forth. But as a judge, I'm absolutely prohibited from doing that. No one has a problem with that fact. So how can we treat Mr. Strada as if he's just an ordinary citizen, gets to show up and say whatever he wants as a public comment when he's a member of the board? I mean, that seems to me to be – just the DNA of the Open Meetings Act seems to completely go against that, that argument. I would agree with you under that construction. However, what he was seeking was – and he sought within the board confines to have an item placed on the agenda to discuss the permitting of well number 18. When the board basically said we're not going to put that on the agenda, he used his right as a citizen of – I believe it's Robertson County – to go to the board during the public comment period and request that item be put. You can't have a board member going around the Open Meetings Act by showing up at a public comment. If we ruled that way, you're just asking for chaos at all of these meetings. I mean, I understand why he's doing what he's doing. It's sort of a political stun, if you ask me, but that's fine. But it just really goes against the DNA of the Open Meetings Act that we're just going to treat a board member as somebody who can go up and make a bunch of public comments at a meeting. That would really circumvent all of these principles that are in there. I mean, you can see why I think that. I can see where you're going with that, but I believe that the underlying purpose of the Open Meetings Act is to make sure there's more transparency in government. Here you have a bunch of interested parties on the board preventing Strada from raising a question that he has about basically the regulatory decisions being made by the district. Is it true that the city attorney said he could have just sat up here like we're on the board and said can we put XYZ on the agenda? I believe that's what he was trying to do, and they prevented him from doing that, Your Honor. Well, they prevented him when he did it as a public comment. I'm talking about if he was sitting on the bench, so to speak, and just said please add this to the agenda for next time. Could they have stopped that? I'm not really sure how that would have been permitted under the Open Meetings Act, but what he had done. Well, that's what they're arguing about, the 42A, but okay, whatever. Okay. You have a few minutes for rebuttal. Thank you. Mr. De La Fuente. Yes, Your Honor. May it please the court, I'm Joe De La Fuente. I'm here for the directors and the district itself. So the appellants. Could you just address that? So if he's a member of the board, the board is just blowing him off. I agree that he can't just go show up as a member of the public, and I find that just to be ridiculous, but what can he do? There are two ways to do it. I mean, yes, he can't be Andy Griffith and just change hats and become a member of the public. But, for example, if someone in the audience has a public comment, raises I think we ought to address this Brian well, that 042A section allows him to comment from the dais, 042B actually, comment from the dais, a member of the public has raised this issue, I would like us to place that on a future agenda. So basically he has to set it up with some friend in advance? Is that what you're saying? That's one way. Well, what is there in the law that prevents him from stepping down and just saying these people would not let us discuss this, I'm advocating transparency, I'm the whistleblower here, we need to put it on the next agenda. What's wrong with doing that? I don't understand. What's wrong is notice. Notice, you don't, you're coming up as a member, nobody in the public has to give notice of what they're going to say, do they? No, Your Honor, they do not. But the Hayes County case interpreting the Open Meetings Act tells us that one, a member of the board cannot change his character within the context of the meeting, practically speaking, cannot be done. Again, it's Andy Griffith, he can't change the hat. And so when that member of the board is speaking, they are speaking as a member of that body politic. How can he get it on the agenda then? He said this thing about the friend, let's forget the friend, how can he? It seemed like y'all were arguing that the lawyer said he could have said it as a board member to put it on the agenda. At the end of every agenda, there is a future discussion of future agenda items. And I think Mr. Strada's problem here is that it takes two members to get any item put on the agenda. But he could raise it. He could raise it. And then somebody else would have to second it. Somebody else would have to second it. It may not ever make it on the agenda. But that's how he should raise it rather than showing up as a member of the public. That's the speech asking. Now, if a member of the public shows up and says, truly a random member says, I think this should be on the agenda, does it necessarily get on the agenda? No. Or does it still have to be blessed by the board? It still has to be blessed by the board. Okay. So this public comment thing was really just an effort to get press, I'm assuming, or something. I'm not here to give you motives, but it clearly got attention. Okay. And it's clear that you just can't suddenly turn yourself into a member of the public when you're a member of the board. I can't suddenly go and be the campaign manager for X or Y as a judge, even though as a private citizen I absolutely could. That's right. And as to the rest of the issues, maybe one of the things I want to tell you. Well, the other issues are important, but I'm going to ask you about 551042 in a minute. Okay. Go back on the ground. You really contend there are no correlative rights? It's that we contend that any nature, existence, or extent of correlative rights is undefined as they would apply to Chapter 36 of the Water Code. And that's why I think there's an order of operations for this court in how it should affirm the trial court's judgment. There's qualified immunity as to the individual directors, which is based on not established law with regard to these underlying Chapter 36 rights, as well as the First Amendment right. And there's kind of a side issue there that counsel mentioned the Webb case and the question of Burford extension with damages being requested. At ROA 28, there is one prayer for damages in this case, and that is Mr. Fusino seeking $100,000 against the individual directors and injunctive relief against everyone else. Well, let me just – well, I took it that you were arguing from Edwards Aquifer Authority that you couldn't have correlative rights in groundwater. In the absence of regulation. No, in the absence of legislation is what you said. Yes. And here we have the 2012 decision of the Texas Supreme Court saying whether groundwater can be owned in place is an issue we have never decided. But we held long ago that oil and gas are owned in place, and we find no reason to treat groundwater differently. In that respect, and I think that's a very good distinction. Okay, so if – I don't think that's a distinction. I think they clearly said there are correlative rights. But even if we take your premise that correlative rights has to be specified somehow, this conservation district did so specify by saying here are the number of surface acres you have to have in order for us – and that's proportional to the amount of water that will allow you to pump. And obviously when the city of Bryan came calling, you ignored that. When the city of Bryan came calling, they fell under the existing well criteria. Chapter 36 of the Water Code allows and actually provides for consideration of historic use wells, existing wells, and new wells. And there's a balance. Yeah, but they weren't an existing well. They had just – they may have started to drill, but they didn't even know they had a well at that point. The term use was significant development. Bryan had done significant development work of the well up to the consideration and passage of that rule. And the reason the existing well rule takes into account that significant development is, well, Your Honors, you all are going to be doing it with Penn Central. You don't want to take away investment-backed expectations. If I've done all this work to drill a municipal well, I've spent all this time and money and effort. In other words, they knew in advance that somebody – that they were going to get to get whatever water they wanted, even if it drained all the neighbor's water. Under the existing regulatory framework at the time that they began their significant development. No, but you didn't implement the new existing historic trichotomy until after they had already started to drill. So they are – in other words, basically they had foreknowledge. They had foreknowledge before they drilled, but not foreknowledge before they began. One does not decide to drill a well and punch a hole. There's a process, and Bryan's amicus brief kind of points that out. So they knew they were going to fall under the existing well grandfather clause and get to arbitrarily pump 3,000 gallons per minute, In short – If he had started a well at the same time, he could have pumped 3,000 also, right? Yes. But he didn't have foreknowledge, did he? That rules were going to be enacted? I mean, I'm not following, Your Honor. I really am not following. Well, it sounds like a stinky deal is what I'm trying to imply, but maybe I'm totally wrong. Well, you just said it, and I get the implication. So let me answer that question, Your Honor. I don't – honestly, I don't know the full public record and – Well, maybe that's why there ought to be discovery in the case. I don't think it matters, Your Honor, in terms of the legal issues presented. No. Well, the way you're describing it to me now, the legal issue is whether they're an existing well as opposed to a new well. And if they're an existing – quote, existing well would be subject to dispute under state law or interpretation of your own regulations, wouldn't it? And that doesn't seem like a matter that requires Burford abstention. It seems like a pretty simple – It's also a matter that was fully considered and vetted in an administrative process in 2006. In the BVGCD, right? Yes, and then an appeal taken to the State Office of Administrative Hearings well after the fact where it was found that there was – that these parties could not contest on that basis. It was a finding that there was an existing well based on the rules application and as written. And I don't – honestly, there's a lot of pleading that they don't meet the criteria for an existing well. The pleading is that they don't like that Brian meets the criteria for an existing well. Okay, then. So then their argument is correct that they're just – because of the way in which all this is working, the city of Brian is being allowed to drain the water under their property. And that is the exact complex question of state law that Day left open and should be adjudicated by a Texas court. Day made – well, Day said you're right, Mark. Day said we do think oil and gas law should be no different here when it comes to finding an ownership interest. Day also went in to say expressly the distinction between oil and gas and why it's not a blanket application. Oil and gas does not replenish. When it's gone, it's gone. Aquifers replenish. Some at a high rate, some at a low rate. It depends on the aquifer. Oil has one use. It's commercial use. You ship it offsite. Water has many uses – use on site, for sale, for agriculture, etc. And that is – Wasn't the Groundwater Conservation District supposed to take all this into account when it's allocating the amounts that people can pump? Yes, Your Honor, when they're establishing their rules and when they're taking these things into account under Chapter 36. And we have a model for how a question of applying a statute and making rules and determining how much people can pump looks like. That's what the Edwards Aquifer Act says. What it looks like here is that the City of Bryan is getting a good deal that nobody else can get. They're a public entity, and therefore it seems like a pretty likely possibility that it's a taking. The City of Bryan is not getting a deal that anyone else who had an existing well couldn't get. I mean, there are classes, and we can all agree that there are some classes that may end up with higher usage. That is absolutely – Your classes are not based on anything other than your historic existing and new well classification, correct? Correct. And that is something that is a – Which was curiously timed to allow the City of Bryan to get in under the wire. There's always going to be someone who beats the filing deadline. I mean, I think we can talk about, well, it's suspicious that someone else drilled this well and did so, got in before the deadline. But there are other existing wells in the district that were not historic used wells that are existing wells. I mean, we don't have that on the record to discuss today. But the essence is the rules are – Chapter 36 talks about historical existing and new wells as criteria. The district created rules that use those criteria in setting its various permitting patents. And whether those are – even first and foremost, whether they comply with Chapter 36, which is the legislature at the behest of the people of Texas by the Constitutional Conservation Amendment, looking at how we're going to regulate groundwater, whether it even complies with Chapter 36 is a question for the courts. Again, Day is a great analog because the EAA Act is a regulatory framework just for one aquifer, just like Chapter 36 is for effectively the remainder of the state. And Day evaluated that, evaluated what the ownership interests are, talked about the concept of fair share conceptually. But whether that applies under Chapter 36, when Chapter 36 says specifically this statute does not entitle anyone to a specific quantity of water. And the arguments that are being advanced are for offset unitization. You know, it seems to me in just about any situation that involves a public taking, there is not a law that, quote, entitles a landowner to anything except the value of his property. And we know that the value of the property here includes the groundwater. And we know that the city entity, that is to say the public, is taking water that must share in this landowner's underlying groundwater. One, not necessarily, because it's a replenishable aquifer. Yeah, but this is Texas. Don't give me that. Well, it's not even funny. We had a serious drought for five years, and it will happen again when the state has 30 million people as opposed to 25. Absolutely. And again, the rate of replenishment depends on the particular aquifer and the rainfall, which we all know the good Lord may or may not bring on any day. Every time I'm flying, it will rain. That's usually a good bet. But fundamentally, we're back at a question of that setup of regulation and should oil and gas and groundwater be treated differently, which they told us they should. It didn't apply as to how. And what that tells us is the Supreme Court of Texas— So there's no such thing as a taking as long as there's a theoretical interest, and we were able to let the city arbitrarily avoid the spacing requirements that would otherwise exist. No, Your Honor. The answer is there's not a taking until we've defined the property interest, and defining the property interest is a question of state law. You said, you know, if you're taking my land, you're taking my land. But when I have real property, I have 749 acres of land. No, they have 2.7 acres. Brian has 2.7 acres. Mr. Fazzino has more acres. More or less enough land to have the pumping plant. Indeed. I mean, the water plant. Indeed. That's amazing. It is. It is the way, you know, Texas groundwater regulation has had to come into a world that existed before Chapter 36 in the Groundwater Districts did. And it's had to apply rules, for example, historic use, which, you know, some folks who had a great agricultural operation were pumping a whole lot of water, got to keep pumping a whole lot of water in some districts, even though the new well restrictions were a lot lower. And that was done in order to accommodate existing short uses. That was because otherwise they would be subject to a taking. Yes, Your Honor. And I would suggest that when you have people who have an existing well, defined as, again, substantial progress, etc., we know the Penn Central factors. If I have gone out and invested in this property, I'm going to use it for a well to develop significant water usage for whatever purpose I'm going to develop it for, and I come in afterwards and say, I know you spent all that money on it, but I'm going to enact a new rule today, and because you haven't pumped as of noon today, when the rule goes into effect, you don't get to produce nearly what you spent all this money to invest on, then we're going to put ourselves in a position for a Penn Central taking. And how those all balance in Chapter 36 is the question for the Texas courts, which have done a good job of examining the scope of groundwater regulation in general and what elements of oil and gas law might apply. Yes, well, if they were to go into state court at this point in time, would you argue statute of limitations? With respect to Brian, I would. And if we were remanded, I would. But, of course, that's an affirmative defense. It's not for the Court of Appeal 12 stage. And that's nature. That isn't based upon which court you're in. You're saying that exists anyway. Yes. Okay. I think the question is is there an additional defense that's created by us dismissing the case or abstaining us, the federal courts? I don't believe so, but I haven't briefed the issue. Okay. Well, I thought Texas had a statute that if a case got dismissed for lack of jurisdiction, then you had 60 days to file it in the state court and you'd be okay or something like that. You could. I don't know if there's a curiosity in this case in that they filed in state court and voluntarily dismissed the day before and avoided younger abstention by doing that, but how those jigsaw pieces would fit together. I remember there being a statute like that. Well, there is. Yeah. I'm not sure how that – once they filed and dismissed voluntarily before, I don't know how that fits in. Yeah. I don't either. But I think it's important to look at the fact that the Texas courts have been perfectly capable of addressing what obviously is not a settled question in terms of the full application. I mean, there's a lot of things Texas courts could address that we address all the time, so I don't know that that's really – That's right. That's right. But then we look at the perfect factors of is this an essential – an important question in state law where there's a need for coherent policy? And this court said that in Sierra – Sierra acknowledged that, and that was just with the EAA Act, which has very localized effect just over the Edwards Aquifer as opposed to Chapter 36. No Texas court has had an opportunity to examine Chapter 36 of the Water Code in view of this expansive approach of correlative rights. Then on the basis of what are you telling us that the Texas courts have been so good at developing the law? You're talking about oil and gas common law, or what are you talking about? In terms of applying oil and – in terms of examining. How much does oil and gas law overlay water law? Because I don't think either of you cited many Texas cases on the subject of water. There's the Guitar Holdings case we cited. There's Day. There's Coyote Lake. Those are kind of the big three Supreme Court cases, and the last two actually do methodically take small oil and gas principles and apply them. One, Day, took the ownership of the water in place. Coyote Lake then said, and we're looking at this, and the accommodation doctrine makes sense. These – the Texas Supreme Court knows the way to apply oil and gas law to water. It has been deliberate and restrained in doing so, and in seeking to expand that, Burford tells us this important question of law needs to stay with a court. That's a fifth Burford factor. Is there an adequate forum in the state? And there clearly is. The Texas Supreme Court is perfectly capable of speaking to this and has. It has not yet spoken to Chapter 36 and how it applies to correlative rights. And the trial court appropriately exercised Burford – its discretion in Burford abstention in not being the first court to write that Chapter 36. Well, actually, he had no right to decide on the basis of Burford at all when he decided that this was an arm of the state, which you're not even arguing on appeal. Your Honor, I will answer your question if I may. Right. He stated them as alternate grounds in his ruling? You can't do that anymore. You can't do that. The Supreme – we used to do that a lot. And then the – it was a long time ago, and I can't cite you the case, but the Supreme Court told us we cannot have contingent rulings on jurisdiction. Well, as we briefed as well, Your Honor, I would think looking at this court's approach in Sierra Club, it would have been abuse of discretion for him not to write that. To the extent that this court needs to rule on that, it would have been abuse of discretion not to abstain. After the qualified immunity dismissal of the individuals in the damages claim, it would have been abuse of discretion not to. He didn't have the right – well, he did have the right to decide qualified immunity, but under the circumstances, that was barely anything. So Burford abstention went only to the county – I mean to the conservation district. And it's superfluous. We can't – I don't see it that it has any legal status at all in this case. Would you like me to address that, Your Honor? Yeah, if you have an answer to that. Yes, Your Honor. I mean we haven't discussed the FARC factors at all. I mean we briefed them. I do think they apply. I think the Wellborn amicus brief counters for them to apply, and that would be a sufficient basis in and of itself to sustain and affirm the trial court's ruling. But as to the application of Burford abstention, if the court finds that the Clark factors and 11th Amendment immunity does not apply, then I believe it would be appropriate for the court to find that nonetheless the trial court abused its discretion in not applying Burford. Okay. Thank you. You've been very thorough. Okay. You're not related to Column Jones? I've heard the other Mr. Jones answer that question by saying allegedly. Allegedly not related? Allegedly related. Oh, okay. I'd like to spend a few minutes discussing what the court seems to be interested in here, and that is . . . Well, we're interested in a lot, so whatever. The application of what we sometimes call oil and gas law and what we sometimes call groundwater law, I don't want to get lost in the rubric and the semantics of that. This court has demonstrated it is very capable of applying Texas real property law, and that at the fundamental level is what we're talking about here. This is just Texas real property law. The court made it clear in day that when you're looking at property law, that the law that has been articulated in the oil and gas field on ownership clearly applies to this other underground fugacious substance called groundwater. And so there's no real distinction to be made there simply because one of the substances has a carbon atom and the other doesn't. And that's, I think, what the court's point was. Well, I think the bottom line would be how would you measure the taking? There are a couple of ways to measure the taking. It involves hydrogeology in one instance to say how much water may have been drained in this cone of depression over time. That's one way. A second way is to say how is the value of Mr. Fazzino's property diminished? The value of a 26-acre tract with a permit to produce 3,000 gallons per minute is much greater than the value of his property if he's only allowed to produce 115 gallons a minute. And so on a pure market basis— I mean, is he really going to do that? What's he going to do with all this water? Sell it to Brian. Sell it. There are a number of markets out there for water. Is he in a position to drain it himself, though? Of course. I mean, this is a right that he has for property that he owns is to pump it. And if he can pump it at 3,000 gallons a minute, his water rights have great value. If he cannot, they do not. So that's the nature of the taking, of course. But it is probably not the case that all of the adjacent landowners would have the same right to pump 3,000 gallons per minute, and therefore your analogy to what the city was permitted to do is too simplistic. Perhaps. But if the rules were applied equally, then the city of Brian would be restricted to some fraction of what is pumping today, and the drainage would stop. And so that's— Do you think a federal court can order that? I think the federal court can issue a— I mean, I've heard of—you know, the point of a taking is to compensate the person whose property is damaged. It's not—I suppose you can enjoin the malfeasance of a public entity, but I don't see how you can take what they've been granted already. Are you talking about taking what the city of Brian has been granted already? Yeah. I think if the—and that gets to this question of historic use permits in general. But if you take what the city of Brian has been granted and cut them back, there may well be a taking on the flip side of that coin, so that the city of Brian— That does sound kind of Burford-esque, that we're going to get in the middle of undoing something that the state has already approved, which is—I mean, that was his original challenge. Bazzino was trying to originally challenge the city of Brian being given this exception. Correct. And you're asking us to kind of go around that and find that improper. I think the primary goal of Mr. Fazzino's suit is a compensation for the taking. All right, but he's trying to do an end run around the notion that he can't challenge the sort of preference that the city of Brian got. And then aren't we violating Burford if we undo that? Because that's something that the state is uniquely situated to address. I don't think we have to undo what's happened already. I think we simply grant Mr. Fazzino one of two things, either compensation for what's been taken from him by the groundwater district by not giving him an equal permit, or a mandate that the rules be applied equally across the board. Again, I think Mr. Fazzino prefers compensation for the taking. And I think that's an adequate remedy in this situation, and I think this court can certainly— And what would that look like? I think that would look like a monetary award. But based on what? The acreage, his acreage, what he should have been able to drain from his own acreage, or what does he have to prove to show—I mean, what does he have to prove to show that he's losing water to them, in essence? Hydrogeologically— And filled it all up. So how much damage does he have that day that Imelda washes into the aquifer? You know, obviously we're getting into what would be the merits of the case. A hydrogeologist would have to testify as to the nature and amount of the drainage in one instance. Or, in the case of the taking, you need an expert witness to say the value of this water, if there was a permit to produce 3,000 gallons a minute, would be X. I just don't think there's ever going to be a theory that Fazzino's entitled to 3,000 gallons a minute. I think the question is your point of, okay, if they're getting the 3,000, which is more than their acreage really justifies, what are they taking from him? And unlike the oil and gas, while I agree there can be droughts, there can also be floods. And so we know that that's not a set situation like it is with oil and gas. The taking of the water, it could be replenished by nature. I mean, I live on a lake that went dry, and it's now full again, or close to full. So I've watched that happen. I know that can happen. So how do you value—how does that work? I'm not sure. How would that work? How are you going to—I mean, I know you say that's the merits, but I think it's relevant to the Burford abstention question. It's relevant to the whole question. How would that look? It's not the same thing as talking about finite gas or oil. I think the right to produce 3,000 gallons a minute is worth a lot more than the right to produce 115 gallons a minute. And I think if you're looking at a potential purchaser of water rights, that's going to be a very relevant factor. And therefore, regardless of the ability of the aquifer to replenish over time or not, and these obviously are aquifers that are being in part replenished by recharge and in part are being mined because the amount of water being taken exceeds the recharge. And so you have those things going on here, but we're looking just at the fundamental issue of what's this worth? What has been taken from Mr. Fazzino, either in terms of water that's been taken or market value that's been taken? Let me ask you a quick question about the state law proceedings. Number one, as I understand it, there is not a definitive state administrative decision that the city had the right to be classified as an existing well because they said your client didn't have standing. Correct. So that is not definitively decided by the state, whoever it is, State Office of Administrative Hearings. Correct. Okay, and number two, that they did not say that this classification and structure used by the GCD is in line with Article 36. That has never been determined. Okay. Well, I had the impression they were saying that this had already been decided in the state administrative scheme. The state administrative proceeding ended with the conclusion that Mr. Fazzino had been standing, and that was it. That's not a determination of the other side. Okay. Anything else? All right. Thank you very much. The court will be in recess for ten minutes.